# Burns v. Commonwealth.

(Decided Oct. 27, 1933.)

B. S. GRANNIS for appellant.

BAILEY P. WOOTTON, Attorney General, H. HAMILTON RICE, Assistant Attorney General, and M. HARGETT, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Near the noon hour on October 4, 1932, the appellant and defendant below, John S. Burns, shot and killed Dee Clark on a prominent street in Flemingsburg, Ky., he at the time being the chief of police of that city. Following appellant's indictment, in which he was charged with murder, he was tried and convicted; his punishment being fixed at confinement in the penitentiary for his natural life. From the order of the court overruling his motion for a new trial, and from the judgment pronounced thereon, he prosecutes this appeal, and his counsel argues in this court, as grounds for reversal: (1) Error of the court in overruling his motion for a change of venue; (2) improper argument of prosecuting counsel; and (3) erroneous and improper instructions, each of which will be determined in the order named.

Immediately following the homicide, some expressions of indignation were heard in the immediate vicinity, and the local papers deprecated and described

the offense in somewhat vigorous terms, and, if the trial had been had at that time, there might have existed some ground for the motion to change the venue; but the proof heard on the motion clearly shows that such feeling, which was limited at the beginning, had greatly abated at the time of the trial, and the affidavits filed by appellant in support of his motion were largely exceeded by opposing and contradictory ones filed by the commonwealth. A large per cent. of the latter were made by officers of the county, including justices of the peace from various portions thereof, and it was clearly made to appear that at the time of the trial there existed no prejudice or animosity against appellant, and that under the conditions then existing he could obtain a fair trial in Fleming county. In such circumstances, we have uniformly ruled that the trial court would not abuse a sound discretion with which it is invested in such matters, in overruling the motion. That rule of practice has been so many times reiterated that no useful purpose could be served by incorporating the cases in which it was done. Nothing happened at the trial to indicate any such public feeling as defendant attempted to establish in support of his motion. On the contrary, it was peaceably conducted and in a dignified and fair manner, and we have no doubt that the jurors who tried the case did so with a conscientious desire to perform their duty and to arrive at the facts impartially from the evidence introduced before them, and according to the instructions of the court. We therefore conclude that this ground is without merit.

■ Before disposing of ground 2, it is proper that we should state the substantial facts as developed by the testimony. Appellant resided in the northern outskirts of the city of Flemingsburg, Ky., and had separated from his wife shortly before the homicide. The evidence shows that he is addicted more or less to the use of intoxicating liquor, and in the earlier forenoon of the fatal day he attempted to get upon a small horse, which he referred to in the record as "his pony," for the purpose of carrying some cream to a customer residing in another part of the city. He was so intoxicated that he could not mount the animal, and a colored man assisted him to do so. The two then went to the customer and delivered the cream, returning by a different route, which is a part of the state highway be-

tween Flemingsburg and the city of Maysville. Near the north municipal boundary on that street and highway a number of laborers were engaged in doing some concrete work for a proprietor of a gas station situated at the side, or possibly extending into a portion of the highway. At the time appellant and his colored companion (who were each riding separate animals) arrived at that place, the laborers were mixing concrete on the adjacent concrete sidewalk. Appellant observed what they were doing, and he also noticed a piece of a green elm root lying in or upon some dirt that had been taken from an excavation that was made for the concrete work. He asked one of the laborers to hand it to him which he said he wanted to use as a switch in riding his pony. The evidence shows that it was about the size of one's finger and some twenty-four or thirty inches long. After receiving it, appellant rode his pony through the concrete then being mixed on the sidewalk, and, while doing so, commenced to strike with the elm root various members of the laboring crew, who dodged and otherwise attempted to escape his blows, which appellant testified were being inflicted through fun, and as a prank and a joke.

While so engaged, the deceased came along the highway from the north, and he at once observed, not only appellant's conduct as so described, but likewise his intoxicated condition, and he approached appellant, and, according to one witness, he said to him: "If you do not go on home I will have to take you up," and that deceased then endeavored to persuade appellant to leave and go home, and at the same time took hold of the bridle bits of the pony and led it off the sidewalk and endeavored to turn its head toward appellant's home, so that the latter might comply with the request made by the officer. Other witnesses say that the officer stated to appellant, in substance, "If you don't go on home I will be compelled to run you in;" but the substance of what all of them stated was that the officer employed language clearly implying that the officer knew that appellant was at that time engaged in violating the law, but that, if he would desist and return to his home, his depredations would be overlooked; otherwise he would be arrested. Appellant demurred, and insisted that he neither had to nor would he go home, and that the officer had no right to make him do

so. Notwithstanding, the officer continued to show leniency towards the appellant by repeating his request with the stated alternative if it was not obeyed.

Finally, the appellant employed in somewhat vigorous manner, according to the evidence, the use of the elm root upon the officer, who, in order to defend himself, drew his ''Billy'' and struck at the appellant, and possibly hit him on the front part of his body. Appellant then drew a pistol, which he was carrying (and which he said was because of possible trouble growing out of the separation of himself and his wife), and fired two shots at the latter. After the firing of the first one, the officer drew his pistol and fired at appellant, who then attempted to shoot a third time at the officer, but his pistol snapped; whereupon the officer pocketed his pistol, and started across the street, no doubt under the impression that appellant had fired all of the cartridges in his pistol; but which it turned out was untrue, since he renewed his firing at the deceased and inflicted upon him the wound that produced his death.

Appellant in his testimony stated that before he resumed shooting on the last and fatal occasion deceased again started towards him with his ''Billy'' in his hand, but that testimony, though corroborated to some extent, was denied by the witnesses for the commonwealth, and which, to say the least of it, created an issue for the determination of the jury. Appellant in answer to a question that was asked him by his counsel, said: ''I shot to stop him from arresting me,'' and which is the answer that was transcribed by the stenographer who took down the testimony. After she so transcribed it, appellant's counsel objected to the word ''arresting,'' and insisted that the word ''rapping'' should be substituted in lieu thereof, so as to make the answer read: ''I shot to stop him from rapping me.'' During the argument, prosecuting counsel referred to the answer as having been made in the language copied by the stenographer, and it is argued in support of this ground that such alleged pervision of the testimony by counsel in his argument was not only improper but prejudicially so, and for which reason the judgment should be reversed. It is proper to say that, when the bill of exceptions came to be filed, the court (no doubt from abundant caution and fairness) corrected it by making the substitution contended for by appellant's

counsel, but all of that occurred after the argument complained of.

Moreover, counsel for appellant ·did not object to the argument when made by prosecuting counsel, and, under the ruling announced in O'Brien v. Commonwealth, 89 Ky. 354, 12 S. W. 471, 473, 11 Ky. Law Rep. 534, and every case following it, the error, if one, cannot be considered by us when it was objected to for the first time in the motion for a new trial. In passing on the specific question in that case, we said: "We cannot consider the point, now for the first time made, that the attorney for the state referred, in his argument to the jury, to certain matters which were not in evidence. No objection was then taken to it, and this was necessary to our consideration of the question." That rule has been consistently followed since and, perhaps, prior to that date. But we would not be understood as holding that the argument was prejudicially improper, under the circumstances, if the point had been properly presented, since at most it was and could have been no more than a mistaken impression of counsel as to the precise word employed by the witness. Although the court later corrected the bill of exceptions containing the transcript of evidence, we are convinced that on the showing made upon the hearing of that motion there was a preponderance of proof to show that the stenographer correctly transcribed the testimony; but for the reasons stated this ground must also be denied.

█ It is argued in support of ground 3 that instruction No. 1 given to the jury by the court erroneously assumed that the place where the transactions resulting in the homicide occurred was a "public place" so as to make appellant's intoxication thereat a public offense; but, without stopping to analyze the instruction so as to determine whether or not it so assumes, we deem it sufficient to say that there is absolutely no doubt whatever that the place was a· public one within the purview of the statute. Appellant was on the public sidewalk, a part of the time in the public street, and never but a few feet from either, and immediately contiguous to a public gasoline station; so that this criticism is not only highly technical, but is absolutely without merit or foundation.

The same instruction is also criticized because it

authorized appellant's arrest by deceased without a warrant if ''he was drunk in the presence of the officer,'' which, it is argued, embraces all places whether public or not. But the evidence was directed to no other place than the one which we have determined was a public one, and, even if the instruction was susceptible to the criticism, it is impossible for it to have misled the jury or in any manner prejudiced the rights of appellant. The instructions defined the duty of the deceased as an officer, and said that he ''was vested with the legal authority to suppress any disturbance of the peace or disorderly conduct being committed in said city in his presence,'' etc. It then told the jury that he had the right to arrest any person so offending in his presence without a warrant, and to also arrest any one guilty of drunkenness in his presence without a warrant, and then said that, if it should believe from the evidence beyond a reasonable doubt that the defendant was at the time committing any such depredations in the presence of the deceased, then the latter had the right to arrest him without a warrant, and it then stated that it then became the duty of the appellant to submit to such an arrest, etc. It is argued in criticism thereof that there was no evidence to show that appellant was committing any such offense or offenses in the presence of the officer; but we are entirely unable to agree with counsel in that contention. Appellant himself admits that he had imbibed more or less liquor on that forenoon, and there was not a witness in the case who did not observe his intoxicated condition, and, so far as that fact is concerned, the testimony is overwhelming that appellant was drunk. The same may be said with reference to his disorderly conduct in riding his horse through the concrete and disturbing the laborers who were engaged in mixing it, and at the same time inflicting physical punishment upon them with the green elm root; but which he insisted that he so employed in playing a prank upon the laborers, whom he knew. But we are acquainted with no such game played in any such fashion. The criticisms referred to are therfore clearly without merit.

But it is again insisted that the deceased did not inform appellant at the time of his intention and purpose to arrest him, but only attempted to drive or force him to go home and to desist from the conduct in which

he was engaged. That criticism is also highly technical when it is remembered that all of the witnesses stated, in substance, that deceased requested appellant to retire to his home, "or I am going to take you up," or, according to another witness, the request of the officer was followed by the language, "or I will lock you up," and by still another that the officer said, "or I will run you in." By so addressing appellant, the deceased was informing him of the purpose to arrest him, but at the same time offering and extending leniency to him by proposing that, if he would go home and desist from his unlawful conduct, he would not be arrested, but, if he declined to do so, then he would be arrested by being locked up. In other words, we mean to say that the officer did inform appellant, in substance, that he would be arrested unless he accepted the proffered escape therefrom by going home. Even appellant in his testimony stated that he invited the officer to arrest him if he had committed any offense, but he insitsed that what he was doing and had done constituted no offense. Because the officer did not employ the specific word "arrest," counsel contends that the instruction in defining the duty of an officer in making an arrest, and the duty of the defendant to submit to an arrest, was grievously erroneous. But the argument necessarily vanishes when the language employed by the officer is tantamount to, and in substance was, a communication to appellant of the intention to arrest him, and the fact that deceased at the same time tendered to him a lenient alternative did not alter the situation. The cases cited and relied on have no bearing because their facts were different, and the principles therein announced were never intended to apply to the state of facts here presented. We therefore conclude that none of the criticisms of the instructions is meritorious.

The evidence in this case portrays the commission by appellant of an unprovoked and inexcusable homicide by killing one who offered to extenuate his offenses, and thereby relieve him from arrest. Instead of accepting such proffered leniency, appellant resisted and offered physical force, culminating in the destruction of the officer's life while he was engaged in an effort to perform his duty, and the verdict of the jury was as merciful as the facts justified.

Wherefore the judgment is affirmed.